## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| PORTLAND CELLULAR PARTNERSHIP, d/b/a VERIZON WIRELESS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 2:14-cv-00274-JDL |
| INHABITANTS OF THE TOWN OF CAPE ELIZABETH, | ) ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| PRISCILLA ARMSTRONG, PAVEL DARLING, AND BRAD KAUFFMAN, | ) ) ) | |
| Intervenors. | ) ) | |

### ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Portland Cellular Partnership, doing business as Verizon Wireless ("Verizon"), has brought suit challenging the denial by the Town of Cape Elizabeth ("Town") of a permit to construct a wireless telecommunications facility. *See* ECF No. 1 at 1. The parties have cross-motioned for summary judgment on the issue of whether the Spectrum Act, 47 U.S.C.A. § 1455 (2015),[1] preempts the Town's ability to deny Verizon's permit request.  ECF No. 29; ECF No. 31; ECF No. 35.  The parties have also filed cross-motions for summary judgment on the issue of whether the Town appropriately applied its zoning ordinance.  ECF No. 39; ECF No. 42; ECF No. 43.

---

[1] Title 47 U.S.C.A. § 1455 is contained in § 6409 of the Middle Class Tax Relief and Job Creation Act of 2012.  Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, § 6409, 126 Stat. 156.

After careful consideration, I conclude that the Town did not err in determining that the Spectrum Act does not apply to Verizon's permit request, but that the Town did err in applying its zoning ordinance and denying the permit.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns Verizon's proposal to build a wireless telecommunications facility ("Proposal") on an existing water tower located at Avon Road in Cape Elizabeth ("Water Tower"). *See* ECF No. 1 at 1. The 80 foot-tall Water Tower sits on a 22,500 square foot parcel of land owned by the Portland Water District ("District"). R. at 14-15, 19. The Water Tower has a small shed nearby and is surrounded by a chain link fence. R. at 19, 35. The District discontinued storing water in the Water Tower in 2007, but continues to use it to maintain and operate a communications antenna, which was installed sometime in the 1980s. R. at 86. The antenna is part of the District's "supervisory control and data acquisition system" ("SCADA system"), which is licensed by the Federal Communications Commission, and is used to communicate with 27 sewer pump stations and the Cape Elizabeth treatment plant. R. at 37, 86. The antenna rises approximately 18 feet above the top of the Water Tower.[2] R. at 20. There is no evidence in the record that the placement and maintenance of the SCADA antenna on the Water Tower has been subject to review or approval under any municipal or state zoning, siting, or regulatory review process. ECF No. 31 at 2.

---

[2] The Town's Zoning Board of Appeals, as well as the District, referred to a single SCADA antenna. R. at 86, 128. The Town and Intervenors suggest that there may be two SCADA antennas. ECF No. 42 at 4 n.3. This variance is inconsequential to the issues presented, and, for that reason, I refer to a single SCADA antenna in conformity with the Board's approach.

Verizon proposes to install wireless telecommunications antennas on the Water Tower. *See* R. at 15. Its Proposal entails the installation of three sets of shrouded antennas, which would be mounted on the sides of the Water Tower near its top. R. at 10, 19, 20. The Proposal also includes a proposed 12 foot by 26 foot equipment shelter to be built near the base of the Water Tower to house equipment associated with the antennas, in addition to various underground utility conduits. R. at 10, 15, 19. The antennas will be connected to the equipment shelter by a cable enclosed in a cable tray. R. at 10, 19. Verizon also proposes to remove part of the existing chain link fence to make way for the equipment shelter, and to thus expand the area of the property that is fenced in. R. at 19.

On February 11, 2014, Verizon submitted a permit application for the Proposal to the Town's Code Enforcement Officer ("CEO"). R. at 9-39. CEO Benjamin McDougal issued a Letter of Denial on March 19, 2014. R. at 73-75. The CEO found that the Proposal was not a permitted use in the "RA Zoning District" under the Town's ordinance. R. at 74. He also rejected Verizon's argument that the Spectrum Act required the Town to issue a permit for the Proposal. *Id.* Verizon appealed to the Town's Zoning Board of Appeals ("ZBA"), R. at 1-8, which voted unanimously at its May 27, 2014, meeting to deny Verizon's appeal of the CEO's decision. R. at 129. On June 24, 2014, the ZBA denied Verizon's request for reconsideration of its decision. R. at 260.

Verizon filed its complaint on July 9, 2014, asserting that the Spectrum Act, Section 1455, requires the Town to approve the Proposal. ECF No. 1 at 8-9. Verizon

also contends that even if the Spectrum Act does not apply, the Town erred in applying its zoning ordinance and should have approved the Proposal as a permitted use. *Id*. at 9-10. In February, I granted the motion to intervene brought by three abutters who joined the case in opposition to Verizon.[3] ECF No. 34. These abutters ("Intervenors") join the Town's motion for summary judgment on both issues. ECF No. 35; ECF No. 43.

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). In making that determination, a court must view the evidence in the light most favorable to the non-moving party. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citations and quotations omitted).

### B.  Local Rule 56

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. *See* Loc. R. 56. In this case, which involves the review of an administrative hearing record, Local Rule 56's requirement for a Statement of Undisputed Material Facts

---

[3] The abutters are Priscilla Armstrong, Pavel Darling, and Brad Kauffman. ECF No. 13.

does not apply, and I have reviewed the case on the Administrative Record/Stipulated Documents submitted by Verizon and supplemented by the Town (ECF No. 23; ECF No. 25). *See* ECF No. 17 at 2.

## III.  DISCUSSION

### A.    The Spectrum Act

The Spectrum Act preempts State and municipal authority to block the placement of certain wireless equipment on existing structures which already house wireless transmission equipment:

> Notwithstanding section 704 of the Telecommunications Act of 1996 (Public Law 104-104) or any other provision of law, a State or local government may not deny, and shall approve, any eligible facilities request for a modification of an existing wireless tower or base station that does not substantially change the physical dimensions of such tower or base station.

47 U.S.C.A. § 1455(a)(1).

The Act defines an "eligible facilities request," in relevant part, as "any request for modification of an existing . . . base station that involves . . . collocation of new transmission equipment."  47 U.S.C.A. § 1455(a)(2)(A).  Here, the parties dispute whether the Water Tower is an "eligible facility," and, if it is, whether Verizon's requested modification under the Proposal would substantially change the Water Tower in violation of Section 1455(a)(1), which provides that an eligible facilities request may be denied if it will "substantially change the physical dimensions" of the structure.

5

### 1.  Whether the Water Tower Is a "Base Station"

Because there is no dispute that Verizon's Proposal involves collocation of new transmission equipment, the Proposal's qualification as an "eligible facilities request" turns on whether the Water Tower is a "base station" within the meaning of the Spectrum Act.  While the Act itself does not define "base station," *see* 47 U.S.C.A. § 1455, the term is defined in the Federal Communications Commission's ("FCC's") implementing regulations as:

> A structure or equipment at a fixed location that enables Commission-licensed or authorized wireless communications between user equipment and a communications network.  The term does not encompass a tower as defined in this subpart or any equipment associated with a tower.

47 C.F.R. § 1.40001(b)(1) (2015).  The regulations provide additional criteria associated with the definition of a "base station" which are the focal point of this case:

> The term includes any structure other than a tower that, at the time the relevant application is filed with the State or local government under this section, supports or houses equipment described in paragraphs (b)(1)(i) through (ii) of this section *that has been reviewed and approved under the applicable zoning or siting process, or under another State or local regulatory review process,* even if the structure was not built for the sole or primary purpose of providing such support.

47 C.F.R. § 1.40001(b)(1)(iii) (emphasis added).  There is no dispute that the SCADA equipment constitutes equipment as described in subsection (b)(1)(i) and, specifically, radio transceivers and antennas under subsection (b)(1)(ii).  *See* 47 C.F.R. § 1.40001(b)(1)(i)-(ii); ECF No. 29 at 6; ECF No. 31 at 7.

Thus, framed in terms of the governing regulation, the decisive question here is whether the placement of wireless telecommunications equipment on the Water

Tower has been "reviewed and approved under [an] applicable zoning or siting process." The parties offer opposing answers.

The Town and Intervenors contend that because the Portland Water District never applied for a permit under the Town's zoning ordinance, or under any other State or local regulatory review process, prior to installing the SCADA antenna, no review or approval ever occurred and the Water Tower cannot be a "base station." ECF No. 31 at 8-9. Thus, the Town asserts that the "mere existence of an antenna or other transmission equipment on a structure other than a tower will not render that structure an existing base station, available for collocation under the Spectrum Act, unless the transmission equipment was subject to *affirmative* review and approval by a state or local government." *Id.* at 7. Under this view, the Water Tower does not meet the regulation's definition of a "base station."

Verizon takes a broader view of the review and approval requirement. Verizon argues that it need not point to a specific permit approving the SCADA equipment, and must only show "that the Town has taken some affirmative step to approve the PWD water tank for the installation of FCC-licensed telecommunications equipment." ECF No. 38 at 3. According to Verizon, that approval occurred in 2000 with the Town's adoption of amendments to its zoning ordinance authorizing and regulating the location of wireless telecommunications facilities. *Id.* at 3-4. The amendments included an "alternative tower structure" provision permitting the placement of wireless facility installations on existing structures, including "clock towers, bell steeples, utility and light poles, and water towers." *See* Cape Elizabeth

7

Zoning Ordinance §§ 19-1-3, 19-6-1(B)(4)(g).  Verizon contends that the Water Tower was the only water tower in Cape Elizabeth at the time of the enactment of the amended ordinance in 2000.  ECF No. 38 at 4.  Based on these facts, Verizon asserts that the Town's inclusion of the Water Tower as an "alternative tower structure" under its zoning ordinance was an affirmative approval of the use of the Water Tower for that purpose:  "Put simply," Verizon argues, "the Town cannot now say that it has never considered the appropriateness of the [District's] water tower for the installation of a wireless facility given that it has expressly determined that such a structure is appropriate."  *Id.*

As the parties' arguments reflect, the Town's zoning ordinance was amended, effective April 15, 2000, to allow in the Residence A District ("RA District") the deployment of a "[c]ommercial wireless telecommunication service antenna which is attached to an alternative tower structure in a manner which conceals the presence of an antenna."  Cape Elizabeth Zoning Ordinance § 19-6-1(B)(4)(g).  The amendments include "water towers" in the list of structures which qualify as "alternative tower structures,"  Cape Elizabeth Zoning Ordinance § 19-1-3, and the Town does not dispute Verizon's assertion that at the time this provision was adopted, the Water Tower was the only water tower in Cape Elizabeth, *see* ECF No. 40 at 3-4.  In sum, with only one water tower within its borders which already had wireless communications equipment mounted on it, the Town amended its ordinance to recognize water towers as an "alternative tower structure" to which wireless communications equipment may be attached.  The question thus becomes whether,

8

for purposes of the Spectrum Act, the Town's zoning amendments qualify the Water Tower as a structure that, at the time of Verizon's permit application, supported or housed qualifying equipment "that has been reviewed and approved under the applicable zoning or siting process, or under another State or local regulatory review process[.]"  47 C.F.R. § 1.40001(b)(1)(iii).  On the record before me, the answer to this question must be no.

The Town did not review and approve the District's SCADA communications equipment mounted on the Water Tower when it amended its ordinance in 2000 to recognize water towers as appropriate locations for wireless communications equipment.  The record is silent as to whether there was any consideration given to the SCADA equipment at that time.  The zoning amendments themselves make no mention of the District's wireless equipment.  Accordingly, it is unreasonable to infer that the Town's amendment of its ordinance to recognize, in application, the one water tower in Cape Elizabeth as an authorized location for the installation of wireless communications equipment, also served, by implication, as a review and approval of the SCADA equipment then maintained on the Water Tower.

Verizon is justified in arguing that "[t]he Town's inclusion of a 'water tower' as an appropriate 'Alternative Tower Structure' is evidence of the Town's affirmative determination of 'the propriety'" of the Water Tower to accommodate wireless communications equipment.  ECF No. 38 at 4.  But this argument misses the mark. The FCC regulation requires, for purposes of federal preemption, that there has been State or local review and approval of the "equipment," and not State or local review

and approval of the "structure"—here, the Water Tower—that is to serve as a "base station."[4]  47 C.F.R. § 1.40001(b)(1)(iii).  Thus, contrary to Verizon's arguments, the adoption of the Town's zoning ordinance amendments in 2000 do not satisfy the FCC regulation's requirement that the SCADA equipment was subject to prior review and approval.  The Spectrum Act does not preempt the Town's application of its zoning ordinance in this case.

Because the Town did not err in concluding that the Spectrum Act does not control Verizon's application, I do not address the secondary issue of whether Verizon's Proposal would "substantially change the physical dimensions" of the Water Tower and, therefore, not be subject to the Spectrum Act for that reason.  47 U.S.C.A. § 1455(a)(1); *see also* 47 C.F.R. § 1.40001(b)(7) (listing criteria for what constitutes a "substantial change").

## B. Whether the Proposal Should Be Permitted under the Cape Elizabeth Zoning Ordinance

The parties have also cross-motioned for summary judgment on Verizon's claim, brought under this court's supplementary jurisdiction, that the Town misinterpreted its own zoning regulations by denying Verizon's permit application on the basis that the Proposal is not a permitted use in the RA District.  ECF No. 39; ECF No. 42; ECF No. 43.  Before addressing the substance of this issue, I first address

---

[4]  Both Verizon and the Town reference various portions of the FCC's rulemaking comments in support of their respective positions.  ECF No. 31 at 5; ECF No. 38 at 5 n.3 (citing 29 FCC Rcd. 12865, FCC 14-153 (Oct. 21, 2014) ¶¶ 168, 174, 175).  Although I have considered the comments cited by the parties and note that they may be employed to support both sides of the issue, they do not factor significantly in my conclusion that the Town's zoning ordinance amendments in 2000 cannot satisfy the requirement of State or local review and approval.  The regulation at issue—47 C.F.R. § 1.40001(b)(1)(iii)—unambiguously attaches the requirement of State or local review and approval to the equipment supported or housed by the structure, and not to the structure.

10

a question not raised by the parties: whether it is the CEO's denial of the permit application, or the ZBA's affirmance of the denial, that is the subject of my review.

The Town's CEO rejected Verizon's permit request in the Letter of Denial dated March 19, 2014. *See* R. at 73-75.  In his Letter of Denial, the CEO concluded that, first, the Town's zoning ordinance did not allow the proposed installation of telecommunications equipment and, second, the Spectrum Act did not apply, and even if it did, the Proposal would substantially change the Water Tower.  R. at 74-75. In his letter, the CEO also referenced his statement made in a previous letter that he sent to Verizon, dated August 23, 2013, that the Water Tower "could not be used as an 'Alternative Tower Structure.'"  R. at 73 (citing R. at 78-79).  On May 27, 2014, the ZBA heard and denied Verizon's administrative appeal of the CEO's decision.  R. at 123-129.

Section 19-5-2 of the Town's ordinance grants the ZBA the power to review decisions of the CEO, "upon written appeal by a party aggrieved by a decision of the [CEO]," including the power to hear administrative appeals "[t]o determine whether the decision of the Code Enforcement Officer is in conformity with the provisions of this Ordinance, to modify such decision to conform with such provisions, and to interpret the meaning of the Ordinance in all cases of uncertainty."  Cape Elizabeth Zoning Ordinance § 19-5-2.  When the court acts in an appellate capacity, it reviews "the operative decision of the municipality."  *Mills v. Town of Eliot*, 2008 ME 134, ¶ 13, 955 A.2d 258 (citing *Yates v. Town of Southwest Harbor*, 2001 ME 2, ¶ 10, 763 A.2d 1168).  In order to determine whether the CEO's decision or the board's decision

11

is the operative one, the court looks to whether the board acted as both fact-finder and decision-maker, in which case the court reviews the board's decision directly. *Id.* If, however, the board acted only in an appellate capacity, then the court reviews the CEO's decision directly. *Id.*; *see also Adams v. Town of Brunswick*, 2010 ME 7, ¶ 11, 987 A.2d 502; *Davis v. SBA Towers II, LLC*, 2009 ME 82, ¶ 10, 979 A.2d 86. Unless the ordinance or statute specifically calls for the board of appeals to act as both fact-finder and appellate review tribunal, the board reviews a decision of the CEO in an appellate capacity only. *See Mills*, 2008 ME 134, ¶¶ 14-16, 955 A.2d 258; *Stewart v. Town of Sedgwick*, 2000 ME 157, ¶ 10, 757 A.2d 773.

Here, the ZBA was acting only in an appellate capacity under the Town's ordinance. *See* Cape Elizabeth Zoning Ordinance § 19-5-2(A). Thus, it is the CEO's decision that is the operative decision subject to judicial review in this case. *See Mills*, 2008 ME 134, ¶¶ 13-16, 955 A.2d 258. I therefore review directly the decision of the Town's CEO, as expressed in his Letter of Denial, "for error of law, abuse of discretion or findings not supported by substantial evidence in the record." *Davis*, 2009 ME 82, ¶ 10, 979 A.2d 86. "Whether a proposed use falls within the terms of a zoning ordinance is a question of law that [this court] review[s] de novo," *Adams,* 2010 ME 7, ¶ 11, 987 A.2d 502; *see also Peregrine Developers, LLC v. Town of Orono*, 2004 ME 95, ¶ 9, 854 A.2d 216 ("Interpretation of a zoning ordinance is a question of law that we review de novo.") (citation omitted), and an ordinance is examined for its plain meaning, *Friends of Congress Square Park v. City of Portland*, 2014 ME 63, ¶ 9, 91 A.3d 601. "Any undefined or ambiguous terms in the Ordinance must be construed

12

reasonably with regard to both the objects sought to be obtained and to the general structure of the ordinance as a whole." *Adams,* 2010 ME 7, ¶ 11, 987 A.2d 502 (quoting *Davis*, 2009 ME 82, ¶ 15, 979 A.2d 86) (internal quotation marks omitted).

Under the Cape Elizabeth Zoning Ordinance ("Ordinance"), the Water Tower is located in the "RA District," which allows certain types of "permitted uses." Ordinance § 19-6-1(B). Permitted uses are divided into four sub-categories: "resource-related uses," "residential uses," "nonresidential uses," and "accessory uses." *Id*. Verizon contends that the Proposal should be allowed under Ordinance Section 19-6-1(B)(4)(g) as an "accessory use," namely, as a "[c]ommercial wireless telecommunication service antenna which is attached to an alternative tower structure in a manner which conceals the presence of an antenna." ECF No. 39 at 7 (quoting Ordinance § 19-6-1(B)(4)(g)). The Town argues in response that the Proposal cannot qualify as an "accessory use" because there is no existing principal use and that the Water Tower is not an "alternative tower structure" because its current sole function is to support an antenna. ECF No. 42 at 8-10, 14-15.

## 1.  Whether the Water Tower Is an "Alternative Tower Structure"

I begin with the issue of whether the Water Tower qualifies as an "alternative tower structure." The Ordinance defines "alternative tower structure" as "[m]ounting structures, such as, but not limited to, clock towers, bell steeples, utility and light poles, and water towers, that conceal the presence of antennas or towers and which are used primarily for purposes other than to support an antenna." Ordinance § 19-1-3. The parties dispute whether the Water Tower is a "[m]ounting structure[] . . .

13

used primarily for purposes other than to support an antenna." Verizon argues that this clause in the definition is capable of multiple interpretations and should be construed in a manner that is consistent with the Ordinance's purpose "to encourage cell phone companies to use existing structures as a mount for new facilities." ECF No. 48 at 7. The Town responds that under a plain reading of the Ordinance, the Water Tower is currently used only to support the SCADA antenna and, therefore, is not "used primarily for purposes other than to support an antenna." ECF No. 42 at 14-15.

A statute or, in this case, an ordinance is ambiguous if it is "reasonably susceptible to different interpretations." *Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶ 23, 58 A.3d 1083 (quoting *Estate of Joyce v. Commercial Welding Co.*, 2012 ME 62, ¶ 12, 55 A.3d 411). As I will soon explain, there are two reasonable interpretations of the Ordinance provision at issue here.

First, the phrase "used primarily for purposes other than to support an antenna" can be read as applying to the specific "mounting structure" at issue and referring to the purposes for which the mounting structure is currently used. That is, a given "mounting structure" may only be an "alternative tower structure" if it is being used primarily for purposes other than antenna support. Under this interpretation, which the Town advances, the Water Tower is not an "alternative tower structure" because it is currently used to support the SCADA antenna.

However, the phrase "used primarily for purposes other than to support an antenna" can also be read as speaking generally of the types of structures which

14

qualify as "alternative tower structures."  That is, a type of structure which is used primarily for purposes other than to support an antenna can qualify as an "alternative tower structure," even if the specific structure at issue is currently used primarily for antenna support.  Under this second view, because water towers are structures that are constructed and generally used for purposes other than antenna support, the Water Tower on Avon Road may qualify as an "alternative tower structure," even if it is no longer used for water storage.

The text of the Ordinance most supports the second interpretation.  First, the Ordinance's definition of "alternative tower structure" lists categories of structures— clock towers, bell steeples, utility and light poles, and water towers—that are not generally used for antenna support, as examples of the relevant mounting structures. Ordinance § 19-1-3.  Second, the Ordinance employs "used" instead of "being used" or "currently used" in the definition.  *Id.*  This drafting choice supports the idea that it is not the current use of a specific structure that matters, but rather, whether the structure belongs to a category of structures primarily used for a purpose other than antenna support.  Moreover, the Ordinance's definition of "structure," "[a]nything *built for* the support, shelter or enclosure of persons, animals, goods or property of any kind . . . ," *id.* (emphasis added), also speaks in terms of the structure's design, and not its current use.  Thus, the word "structure" as employed in the term "mounting structure" in the definition of "alternative tower structure" focuses on the designed purpose of a structure, regardless of the structure's then-current primary use.

Treating the term "alternative tower structure" as focusing on a structure's design, rather than its current use, is also supported by the objects of the Ordinance, *see Adams,* 2010 ME 7, ¶ 11, 987 A.2d 502.  The Ordinance includes at least three provisions regarding the placement of wireless antennas that are relevant to this analysis.  Section 19-8-12 encourages the collocation of wireless antennas.  Ordinance § 19-8-12(2)(a).  Section 19-6-13 restricts the areas in which wireless towers and antennas may be placed.  Ordinance § 19-6-13, Tower Overlay District Map.  Finally, the "alternative tower structure" provisions of the Ordinance allow the placement of antennas on certain existing structures when placement would otherwise be prohibited.  *See, e.g.*, Ordinance § 19-6-1(B)(4)(g).  Considered together, these provisions demonstrate that the Ordinance is intended to reduce the number of different locations within Cape Elizabeth where antennas may be sited, and to place new antennas alongside existing antennas or on existing structures, wherever possible.

If I were to adopt the Town's interpretation of the Ordinance, the Water Tower could support the Proposal only if the SCADA antenna was removed.  This would mean that the SCADA antenna and Verizon's antennas would have to be placed at separate locations, a result which would defeat the Ordinance's preference for antenna collocation and for minimizing the number of antenna sites.  In contrast, interpreting "alternative tower structure" so as to include the Water Tower facilitates placement of the Proposal on an existing structure that already contains an antenna.  This is consistent with the very object of the Ordinance.

16

Accordingly, I conclude that the Water Tower is an "alternative tower structure" under the Ordinance and the CEO erred in his decision.

### 2. Whether Verizon's Proposal Qualifies as an "Accessory Use"

The Ordinance defines an "accessory use" as "[a] use that is incidental and subordinate to the principal use," and states that "[t]he principal use shall not become subordinate to accessory uses, when aggregated." Ordinance § 19-1-3. Verizon claims that the Water Tower is principally used to support the SCADA antenna, which is part of the District facility at the site, and is maintained, along with all other District property, as a public utility. ECF No. 39 at 8-10; ECF No. 48 at 2. Verizon argues that the current principal use of the Water Tower is therefore providing "essential services" as defined in the Ordinance and that the Proposal will be an accessory use which will remain subordinate to the principal use made of the property. ECF No. 39 at 8; ECF No. 48 at 2-3.

The Town makes several different arguments to the contrary: (a) the CEO, and the ZBA on appeal, correctly found that there is no principal use of the Water Tower to support an accessory use, because the Water Tower is no longer used for water storage, ECF No. 42 at 9-10; (b) the Proposal would supplant the SCADA system as the Water Tower's primary use, *id.* at 12; and (c) the possibility of additional antenna installations in the future ensures that the SCADA antenna will become subordinate to wireless telecommunications facilities, *id.* at 9, 12-13. I address each of these points in turn.

17

### a. The Property's Principal Use

The CEO's conclusion that the Water Tower does not have a principal use belies the reality that the District maintains and uses the Water Tower and nearby shed as part of its SCADA system, *see* R. at 86.  The District's use of the property, therefore, meets the Ordinance's definition of "essential services": "Utility facilities including gas, electrical, communication, steam, fuel, water or sewage transmission, collection, or distribution systems."  Ordinance § 19-1-3.  The definition is phrased in general terms and in categories of utilities—such as water and sewage systems—and does not distinguish among components of such utilities or the various activities they involve.  Treating the water tank and the SCADA antenna, which are both components of the District's facility, as part of the District's utility function as a whole, is consistent with the definition.  Section 19-6-1, governing uses in the RA District, allows "[p]ublic utilities/essential utility services" as a permitted resource-related use, by reference to uses permitted in specified districts.[5]  *See* Ordinance §§ 19-6-1(B)(1)(a), Table 19-6-9 No. 21.  For these reasons, the District's use of the property is, for zoning purposes, "essential utility services."

---

[5] The Intervenors raise the question of whether a resource protection permit was ever issued in correspondence with the "[p]ublic utilities/essential utility services" use that Verizon claims is the principal use permitted under Section 19-6-1(B)(1)(a).  ECF No. 52 at 2-3.  The existence or nonexistence of such a permit was not addressed by the CEO and was not a basis for his denial of Verizon's permit application.  It is reasonable to infer that the District's utility is a permitted use because the District has maintained the Water Tower on the property for several decades.  Further, "[p]ublic utilities/essential utility services" is a type of use specifically identified and defined in the Ordinance, *see* Ordinance §§ 19-1-3 (defining "Essential Services"); Table 19-6-9 (listing "[p]ublic utilities/essential utility services"), and allowed in the RA District as a non-accessory use—thus it is reasonable to designate the principal use of the Water Tower by reference to this identified category of use.

The District's principal use of the property for essential utility services applies whether or not the SCADA antenna is considered an "accessory use."  The Town posits that if the SCADA antenna, for which no Town permit was ever issued, must be characterized as a particular type of use under the Ordinance, it would be as an "accessory use" as an "[a]mateur or governmental wireless telecommunication facility antenna" under Ordinance Section 19-6-1(B)(4)(e).  ECF No. 42 at 10 n.7; ECF No. 52 at 3; ECF No. 53 at 2.  The Town claims that since the water tank was disconnected in 2007, the SCADA antenna has been an "accessory use" unsupported by a principal use, so that Verizon's antennas cannot be permitted as an "accessory use."  ECF No. 53 at 2-3.  This argument is, however, contrary to the Ordinance's definition of "accessory use."  Ordinance § 19-1-3.

As previously noted, an "accessory use" is one "that is incidental and subordinate to the principal use."  *Id.*  The identification of an "accessory use" is, therefore, dependent upon the existence of a principal use.  Here, the principal use of the property, viewed as a whole, is the District's operation of its SCADA system, an activity which qualifies as "essential services," which is an authorized principal use in the RA District.  The SCADA antenna is a part of this principal use, but even if that conclusion is in error, it is also authorized as an accessory use to the other components of the SCADA system on the property— including the water tank and shed—which is the principal use.  The antenna is but one part of the system and, as measured by size and intensity of use, is incidental and subordinate to the operation of the SCADA system.  Thus, whether the SCADA antenna is viewed as being a

19

constituent part of the SCADA system or, is viewed in isolation as an accessory use, the presence of the SCADA antenna is compatible with the installation of Verizon's proposed antennas on the Water Tower as an accessory use that is "incidental and subordinate" to the principal use.

The Law Court has recognized that an accessory use or structure is a use or structure "by custom . . . commonly, habitually and by long practice established as reasonably associated with the primary use or structure." *Town of Shapleigh v. Shikles*, 427 A.2d 460, 465 (Me. 1981). The Law Court has also identified factors which may be relevant for determining whether a use or structure is accessory within the terms of a zoning ordinance as including "the size of the land area involved, the nature of the primary use, the use made of the adjacent lots by neighbors, the economic structure of the area and whether similar uses or structures exist in the neighborhood on an accessory basis." *Town of Shapleigh*, 427 A.2d at 465; *Lane Const. Corp. v. Town of Washington*, 2008 ME 45, ¶ 21 & n.4, 942 A.2d 1202.

Here, both the federal Spectrum Act and the Town's zoning ordinance reflect the established practice of treating antennas as an accessory use that is reasonably associated with the primary use of alternative tower structures such as water towers. *See* 47 C.F.R. § 1.40001(b)(1)(i)-(iii) (defining "base station" to include structures "other than a tower" that were "not built for the sole or primary purpose" of providing support to equipment associated with wireless communications services and antennas, inter alia); Ordinance §§ 19-1-3 and 19-6-1(B)(4)(g) (respectively, defining "alternative tower structure" to include water towers and providing for the

attachment of commercial wireless antennas to an "alternative tower structure"); *see also* 29 FCC Rcd. 12865, FCC 14-153 ¶¶ 50-54 (discussing the expansion of the categorical exclusion from certain National Environmental Policy Act (NEPA) review to include antennas collocated on existing man-made structures other than buildings or antenna towers, including water towers); *Sprint Spectrum, L.P. v. Town of Ogunquit*, 175 F. Supp. 2d 77, 90 (D. Me. 2001) (observing that the record in the case "shows that co-location of wireless antennas on existing structures is a common means of providing service coverage").   In addition to Ordinance Section 19-6-1 governing the RA District, the sections of the Ordinance governing a number of other districts in the Town likewise provide for commercial antennas to be attached to an "alternative tower structure" as an accessory use.  *See, e.g.*, Ordinance §§ 19-6-2(B)(4)(g) (Residence B District); 19-6-4(B)(4)(i) (Town Center District); 19-6-5(B)(4)(h) (Business District A).

Accordingly, Verizon's Proposal qualifies as an accessory use, and this conclusion is valid under the Ordinance whether the SCADA antenna is considered an existing accessory use, or is considered to be a part of the property's existing principal use.

### b. Verizon's Proposal Will Not Supplant the Property's Existing Principal Use

As just discussed, the deployment of wireless antennas on alternative tower structures, including water towers, is a use that is established as an accessory use that is reasonably associated with the primary use of such structures.  The record demonstrates that the Proposal will not supplant "essential services" as the

21

property's principal use.  The SCADA antenna has been at the Water Tower for roughly 30 years, and is expected to remain there indefinitely.  R. at 86.  The Proposal does not call for alteration of the SCADA system, *see* R. at 9-10, nor is there evidence that the Proposal will add to the activity that takes place on the property to any appreciable degree, *id.*[6]  The District is "very reliant" on the site for the operation of its SCADA system, and the system's failure could potentially result in "everything from flooded basements with raw sewage to the discharge of millions of gallons of sewage overflow into Casco Bay."  R. at 139.[7]  All indications are that the use of the property to maintain the District's operation of its SCADA system will continue indefinitely.

In addition, contrary to the Town's assertion, the Proposal will not become the physically dominant use of the property.  Given the size of the District's water tank and the property as a whole, the addition of Verizon's shrouded antennas and equipment shelter will dominate neither the existing structure nor the parcel itself.  The Water Tower stands at 80 feet tall, R. at 15, 19, and the District's lot covers 22,500 square feet, R. at 14.  In comparison, the proposed antennas and fiberglass shrouds (which will extend less than five feet from the tank railing and less than ten feet from the water tank), the 12 foot by 26 foot equipment shelter, and the other

---

[6]  Verizon's permit application indicates that there will be approximately one site visit a month by a Verizon technician.  R. at 10-11.

[7]  The Town contends that this information from a District document submitted with Verizon's request for reconsideration cannot be relied upon because it was not before the ZBA when it first heard the appeal of the CEO's decision.  ECF No. 42 at 10, 15; ECF No. 53 at 3.  Whether this information is properly part of the record or not, it is apparent and beyond serious dispute that the failure of the system that monitors systems that process raw sewage could lead to sewage spills and overflow.

equipment that are part of the Proposal, are substantially smaller.  *See* R. at 6, 12, 19-20 (Verizon's site plan), 36 (photo simulation of Proposal).

### c.  Future Additional Antennas

The Town also contends that Verizon's Proposal does not qualify as an "accessory use" because it will lead to other wireless telecommunications carriers placing additional antennas on the Water Tower, and that the cumulative impact of the future additions, when aggregated, will make the principal use of the property subordinate to these accessory uses.  ECF No. 42 at 9, 12-13; ECF No. 53 at 4-5. Verizon responds that the Town's future development argument is unduly speculative, noting that there are no pending applications by other wireless carriers to add antennas to the site.  ECF No. 48 at 5-6.

The record reflects that other wireless carriers may seek to install antennas on the Water Tower, and the possibility of additional antennas and equipment being placed at the Water Tower is reasonably possible.  Verizon's lease agreement with the District allows for the addition of up to three tenants, R. at 111, and, at the same meeting where the ZBA denied Verizon's appeal of the CEO's decision, the ZBA heard and denied an appeal by AT&T of the CEO's denial of its permit application to build a wireless facility, R. at 123, 130-31.  The Town and Intervenors point to these facts as showing that "Verizon's facility, if approved, would pave the way for other wireless facilities on the tower" and that the District's use of the Water Tower to support the SCADA antenna will become subordinate to the "significant and expanding use" of the Water Tower by commercial wireless carriers.  ECF No. 42 at 9, 12-13.  The Town and Intervenors also contend that with the installation of Verizon's Proposal under a

23

building permit from the Town, the Water Tower will, moving forward, be subject to the Spectrum Act because the Water Tower will then be a structure that supports or houses wireless communications services equipment "that has been reviewed and approved under the applicable zoning or siting process . . ." and, therefore, a qualifying "base station," *see* 47 C.F.R. § 1.40001(b)(1)(iii).  *See* Oral Arg. Hr'g, Aug. 6, 2015.

Contrary to the Town and Intervenors' arguments, however, if the approval of Verizon's Proposal results in the Water Tower becoming subject to the Spectrum Act—a question I need not and do not decide—the Town will retain the discretion to review proposals to install wireless communications antennas on the Water Tower under the Act's "substantial change" provision, 47 U.S.C.A. § 1455(a)(1); *see also* 47 C.F.R. § 1.40001(b)(7).  The "substantial change" criteria include, among other things, increases of a certain size in the height of a structure or protrusions from the body of a structure by a certain distance, as well as the installation of new equipment cabinets, resulting from a proposed modification.  47 C.F.R. § 1.40001(b)(7)(i)-(iii).[8] Because the Town is not required by the Spectrum Act to approve an otherwise eligible facilities request that substantially changes the physical dimensions of the "base station," it is far from certain that the Town will be compelled to grant a permit for every future carrier seeking to install antennas and equipment at the Water Tower.  Accordingly, and contrary to the Town's argument, the approval of Verizon's

---

[8]  The FCC's comments clarify that the "substantial change" criteria for changes in height are to be applied as limits on cumulative changes.  29 FCC Rcd. 12865, FCC 14-153 ¶¶ 196-197; *see* 47 C.F.R. § 1.40001(b)(7)(i)(A).

Proposal will not inexorably lead to the subordination of the property's existing principal use to accessory uses.

In addition, although the record establishes that AT&T previously and unsuccessfully sought permission from the Town to place antennas on the Water Tower, there are no pending applications. Thus, other than speculation, there is no basis on this record to measure the likelihood that future proposals will result in the property's current principal use becoming subordinate to accessory uses proposed in the future. *See Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 16, 832 A.2d 765 ("A finding of cumulative impact will often require reasonable extrapolation from present facts, but such a finding must have as its source actual facts from which to anticipate future impact.").

For the foregoing reasons, I conclude that the Proposal is an "accessory use" under the Ordinance and the CEO erred in concluding otherwise.

### 3.  Whether the Antennas Will Be Concealed

The Ordinance also requires that the Verizon antennas, as commercial antennas attached to an "alternative tower structure," be concealed. *See* Ordinance §§ 19-1-3 (defining "alternative tower structure" as "[m]ounting structures . . . that conceal the presence of antennas or towers . . ."), 19-6-1(B)(4)(g) (listing as a permitted accessory use a "[c]ommercial wireless . . . antenna which is attached to an alternative tower structure in a manner which conceals the presence of an antenna"). The CEO did not make findings with respect to antenna concealment, R. at 73-75, stating in his August 23, 2013, letter (referred to in the Letter of Denial) that the question of

25

concealment would be referred to the Planning Board, per Ordinance Section 19-3-2(C), if the requirements of "alternative tower structure" and "accessory use" were met, R. at 78-79.  The Ordinance gives the CEO the discretion to refer an antenna installation application to the Planning Board "if the antenna concealment is not complete":

> No installation of a commercial wireless telecommunication antenna on an alternative tower structure shall occur until after the issuance of a Building Permit by the Code Enforcement Officer in accordance with Sec. 19-3-3, except that the Code Enforcement Officer may refer the antenna installation application to the Planning Board for review under Sec. 19-9, Site Plan Review and Sec. 19-8-12, Tower and Antenna Performance Standards, if the antenna concealment is not complete.

Ordinance § 19-3-2(C).

According to Verizon's permit application, the antennas will be covered from view by a 3-sided fiberglass shroud; the cable connecting the equipment shelter to the antennas "will be enclosed in a cable tray that will be painted to match the color of the tank."  R. at 10.  The parties dispute, however, whether it is clear from the permit application that Verizon's intended antenna concealment would be "complete" for purposes of the Ordinance.  *See* ECF No. 39 at 10-11; ECF No. 42 at 8 n.5.  Verizon, however, recognized in its request for reconsideration that this was an issue that requires the CEO to consult with the Planning Board.  R. at 137.  More information than is currently available in the record before me is required for a definitive resolution on the issue of concealment, including whether the question of concealment should be referred to the Town's Planning Board.  Accordingly, I deny both Verizon's and the Town's motions for summary judgment on this specific issue.

26

### 4. Whether the Equipment Shelter Is a Permitted "Accessory Building"

Finally, I address the question of whether Verizon's proposed equipment shelter is permitted by the Ordinance.  Section 19-6-1 lists "[a]ccessory building, structure or use" as a permitted accessory use in the RA District.  Ordinance § 19-6-1(B)(4)(a).  The Ordinance defines "accessory building or structure" as "[a] detached, subordinate building, the use of which is clearly incidental and related to that of the principal building or use of the land, and which is located on the same lot as the principal building or use." Ordinance § 19-1-3.  The Town argues that the equipment shelter must be authorized separately from the antennas and that it does not qualify as an "accessory building or structure" because it is not related to the District's SCADA antenna or use of its property.  ECF No. 42 at 13; ECF No. 53 at 4.  The Intervenors also argue that an "accessory building" must be related to the principal use of the principal building or property.  ECF No. 52 at 4-5.

Under Section 19-1-3, the use of an "accessory building or structure" must be "clearly incidental and related to *that* of the principal building or use of the land." Ordinance § 19-1-3 (emphasis added).  By a plain reading of the definition, the pronoun "that" refers to "the use" of the "principal building" and is not restricted to the *principal* use of the "principal building." The proposed equipment shelter would be a detached, subordinate building located on the same lot and next to the Water Tower, the "principal building."  The use of the Water Tower, as found above, would comprise the principal use of "essential services" by the District and the accessory use of Verizon's wireless antennas.  The use of the equipment shelter to support Verizon's

antennas will, therefore, be "clearly incidental and related to that of the principal building," i.e., the Water Tower.  Accordingly, the equipment shelter qualifies as an "accessory building or structure," and is, therefore, a permitted accessory use.[9]  This construction is consistent with Section 19-8-12, which encourages collocation of antennas and recognizes that antennas will be accompanied by other equipment and facilities.  *See* Ordinance § 19-8-12(2)(a) (referring to collocation of "antennas, equipment and facilities on a tower and site" and "the construction and maintenance of colocated antennas and infrastructure").  For these reasons, I conclude that the equipment shelter is an "accessory building" that is permitted under the Ordinance.

## IV.  CONCLUSION

To summarize, the Spectrum Act does not apply to the Proposal because the Proposal does not qualify as an "eligible facilities request."  Therefore, the Act does not mandate that the Town approve Verizon's permit request.  Verizon's motion for summary judgment on Count I (ECF No. 29) is therefore **DENIED**; the Town's cross-motion on Count I (ECF No. 31) and Intervenors' cross-motion on Count I (ECF No. 35) are **GRANTED**.  I also conclude that the Proposal is a permitted accessory use under the Town's Ordinance.  Accordingly, Verizon's motion for summary judgment on Count II (ECF No. 39) is **DENIED** only as to the issue of whether the antennas will be concealed as required by Ordinance Sections 19-1-3 and 19-6-1(B)(4)(g), and

---

[9]  Thus, the equipment shelter is an accessory use itself under Section 19-6-1(B)(4) and not "an accessory building in support of an accessory use," as the Intervenors have referred to it, ECF No. 52 at 4-5, and which in those terms is not provided for by the Ordinance.  The Intervenors also assert that the equipment shelter cannot be permitted because Verizon's permit request did not involve the required site plan review.  ECF No. 52 at 5 n.3 (citing Ordinance § 19-9-2).  To the extent that site plan review and approval is required, it remains available to be carried out as appropriate under the provisions of the Ordinance.

is **GRANTED** in all other respects.  The Town's cross-motion on Count II (ECF No. 42) and Intervenors' cross-motion on Count II (ECF No. 43) are **DENIED** in all respects.

      **SO ORDERED.**

                                        **/s/ Jon D. Levy**
                                        **U.S. District Judge**

**Dated this 30th day of September, 2015.**